**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**TRINITY BEHAVIORAL HEALTH**
**CARE SYSTEM, INC. and MAXUS, INC.**                    **PLAINTIFFS**

**v.**                    **Case No. 4:14-cv-00651 KGB**

**ARKANSAS DEPARTMENT OF**
**HUMAN SERVICES, et al.**                    **DEFENDANTS**

<u>**TEMPORARY RESTRAINING ORDER**</u>

Before the Court is plaintiffs Trinity Behavioral Health Care System, Inc. ("Trinity") and

Maxus, Inc.'s motion for temporary restraining order and preliminary injunction (Dkt. No. 2).

In its initial consideration of this motion, the Court determined that Trinity and Maxus

did not meet the requirements for this Court to consider issuing an *ex parte* temporary restraining

order because Trinity and Maxus had not complied with Federal Rule of Civil Procedure

65(b)(1)(B).  In their moving papers, Trinity and Maxus's counsel did not certify in writing any

efforts made to give notice and the reasons why notice should not be required.  Accordingly, the

Court notified defendants of this action and scheduled a hearing on the motion for temporary

restraining order for Friday, November 7, 2014.

The Court held this hearing, and defendants were present through their counsel.

Defendants also filed prior to the hearing a preliminary response in opposition to the motion for

temporary restraining order (Dkt. No. 7).  Despite this, the Court concludes that the hearing did

not allow defendants a sufficient opportunity to challenge the basis for plaintiffs' requested

relief.  Therefore, the Court only considers the motion for temporary restraining order at this

time.  *See, e.g.*, *Piraino v. JL Hein Serv. Inc.*, No. 4:14-CV-00267-KGB (E.D. Ark. May 16,

2014) (citing *McLeodUSA Telecomms. Servs. v. Qwest Corp.*, 361 F. Supp. 2d 912, 918 n.1 (N.D. Iowa 2005)).

## I.        Background

Trinity is licensed to provide psychiatric services to children in Arkansas through inpatient and residential treatment. Maxus provides outpatient mental health counseling to juvenile and adult patients. Trinity and Maxus allege that defendants, Arkansas Department of Human Services ("ADHS"); the Director of ADHS, John Selig; and the Director of the Division of Medical Services of ADHS, Dawn Stehle, (collectively "ADHS"), have wrongfully suspended Medicaid payments to Trinity and Maxus.

Trinity and Maxus claim that, on October 7, 2014, DHS issued letters to Trinity and Maxus purportedly pursuant to 42 C.F.R. §455.23(a) notifying the providers of the suspension of their Medicaid payments effective November 6, 2014, because the agency determined there were credible allegations of fraud against the providers for which an investigation is ongoing. More specifically, that letter from ADHS states:

> Because of the large number of beneficiaries impacted by this action, [A]DHS finds that good cause exists to immediately suspend payment only in part. Effective with the date of this letter, [A]DHS will immediately suspend Medicaid payments for any new inpatient admission and for any new outpatient beneficiaries. All remaining payments will be suspended thirty (30) days from the date of this letter, to allow for existing beneficiaries to transition to new providers. [A]DHS finds that this delay is in the best interests of the Medicaid program, so as to ensure continuity of care and to avoid the duplicative or unnecessary expense that could be caused by an immediate transition.

(Dkt. No. 3, Exhibit E, at 150-151).

In this action, Trinity and Maxus claim that defendants lacked authority to suspend Medicaid payments under Ark. Code Ann. §§ 20-77-2505, -2506, -2508; that defendants' suspension of payments violates 42 C.F.R. § 455.23 and Trinity and Maxus's due process rights

under the Fourteenth Amendment to the United States Constitution; that the suspension of payments violates the due process rights of Trinity and Maxus's patients; and that the suspension of payments violates certain provisions of the Medicaid statutory and regulatory scheme set out in 42 U.S.C. § 1396. In their instant motion, Trinity and Maxus ask this Court to enter a temporary restraining order that prevents defendants from suspending these Medicaid payments. Specifically, in their motion, Trinity and Maxus

> request that this Court grant their Motion for a Temporary Restraining Order and Preliminary Injunctive Relief and stay enforcement of the suspension and preserve the status quo as it existed before October 7, 2014, until such time as Plaintiffs are afforded a full and fair administrative review of DHS' decision to issue the suspension and Plaintiffs receive a ruling following the hearing. Plaintiffs further request that in the event the suspension is not overturned at the administrative hearing level, this Court order the suspension stayed until such time as the patients currently receiving treatment at the Providers' facilities secure alternative care.

(Dkt. No. 2, at 5).

## II.    Discussion

When determining whether to grant a motion for a temporary restraining order, this Court considers: (1) the threat of irreparable harm to the movant; (2) the balance between the harm to the movant and the injury that granting an injunction would cause other interested parties; (3) the public interest; and (4) the movant's likelihood of success on the merits. *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013) (quoting *Dataphase Sys. Inc. v. CL Sys.,* 640 F.2d 109, 114 (8th Cir.1981)). Preliminary injunctive relief is an extraordinary remedy, and the party seeking such relief bears the burden of establishing the four *Dataphase* factors. *Watkins Inc. v. Lewis,* 346 F.3d 841, 844 (8th Cir. 2003). The focus is on "whether the balance of the equities so favors the movant that justice requires the court to intervene to preserve the *status quo* until the merits are determined." *Id.* "Although no single factor is determinative when balancing the equities," a

lack of irreparable harm is sufficient ground for denying a temporary restraining order. *Aswegan v. Henry*, 981 F.2d 313, 314 (8th Cir. 1992). Thus, "[t]he threshold inquiry is whether the movant has shown the threat of irreparable injury." *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371 (8th Cir. 1991).

### 1.    The Threat Of Irreparable Harm

A plaintiff seeking temporary injunctive relief must establish that the claimant is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). As a general rule, economic loss does not constitute irreparable harm. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974). A threat of irreparable harm exists when a party alleges a harm that may not be compensated by money damages in an action at law. *See Kroupa*, 731 F.3d at 820; *Glenwood Bridge, Inc.*, 940 F.2d at 371-72. Accordingly, "[l]oss of intangible assets such as reputation and goodwill can constitute irreparable injury." *United Healthcare Ins. Co. v. Advance PCS*, 316 F.3d 737, 741 (8th Cir. 2002). Furthermore, a threat of irreparable harm may exist when relief through money damages in an action at law will not fully compensate a claimant's economic loss. *See Glenwood Bridge*, 940 F.2d at 367. For example, the potential for irreparable harm is present "when the potential economic loss is so great as to threaten the existence of the moving party's business." *Fort Smith Beepers, Inc. v. Mobilefone Serv., Inc.*, 533 F. Supp. 685, 688-89 (W.D. Ark. 1981) (quoting *Paschall v. Kansas City Star Co.*, 441 F.Supp. 349, 357 (W.D. Mo. 1977)); *see also Ryko Mfg. Corp. v. Delta Servs., Inc.*, 625 F. Supp. 1247, 1248 (S.D. Iowa 1985) ("Yet, irreparable injury has been characterized as loss of a movant's enterprise.").

Here, Trinity and Maxus allege that ADHS's suspension of Medicaid payments threatens irreparable harm to Trinity and Maxus as providers and to Trinity and Maxus's patients. Trinity

and Maxus have presented affidavits and exhibits supporting their claim that they "will suffer irreparable harm if their Medicaid payments are suspended prior to the resolution of the administrative appeal" (Dkt. No. 3, at 33). An affidavit from Trinity and Maxus's Compliance Director, Kristi Kirk, indicates that "Medicaid beneficiaries make up over 99% of [Trinity and Maxus's] patients" (Dkt. No. 3, Ex. A, ¶ 7). Further, affidavits from Dr. Thomas Stinnett, a physician at Trinity and Maxus, indicate that Medicaid payments account for "over 99% of [Trinity and Maxus's] revenue" (Dkt. No. 3, Ex. B, ¶ 9; Ex. C, ¶ 10). Accordingly, Trinity and Maxus argue that the suspension of their Medicaid payments will "cause [their] permanent destruction and [that they] will immediately be forced out of business if the suspension is permitted to take effect" (Dkt. No. 3, at 10). Trinity and Maxus have provided some factual support for this allegation in the materials filed with the Court. (*See* Dkt. No. 3, Exhibit B, ¶ 8; Exhibit C, ¶ 9; and Exhibit F).

ADHS argues that "Plaintiffs cannot claim an irreparable harm from a temporary suspension of Medicaid payments to which they are not legally entitled" (Dkt. No. 7, at 7). ADHS contends that its suspension of Medicaid payments to Trinity and Maxus does not affect these providers' Medicaid provider contracts, debar them from government business, or limit their ability to admit or treat private-pay patients. ADHS does not argue against Trinity and Maxus's claims that 99% of their patients are Medicaid beneficiaries and that 99% of their funding comes from Medicaid payments. Moreover, at this point in the proceedings, ADHS has not contested Trinity and Maxus's claims that a suspension of their Medicaid payments will result in these facilities closing their operations and that these damages cannot be compensated adequately through an action for money damages.

Therefore, based on the limited information and documents in the record before it, the Court determines that Trinity and Maxus have sufficiently shown that, without a temporary restraining order to preserve the status quo, they will likely suffer irreparable harm.

### 2.    Balance Of Equities And Public Interest

Trinity and Maxus argue that the aforementioned threats of injury to them outweigh "the only potential harm to Defendants, . . . [which] is a temporary delay in the administrative process" (Dkt. No. 3, at 33).  Trinity and Maxus also contend that ADHS's purported "credible allegation of fraud" does not accuse Trinity or Maxus of providing inadequate treatment to patients or misappropriating or mishandling Medicaid funds.

ADHS argues that the equities favor it because the agency was compelled under federal regulations to suspend Trinity and Maxus's Medicaid payments.  Furthermore, ADHS points to the underlying allegations of fraud and its responsibility to protect public funds and preserve ongoing investigations as tipping the balance in its favor.  The underlying allegation of fraud here stems from a former ADHS official admitting to his participation in a bribery scheme by pleading guilty to a criminal information.  The factual basis for the plea to the criminal information identified "Person C" as the owner of two mental health companies, "Company A" and "Company B."  (*See* Dkt. No. 3, at 204-17).  According to counsel for Trinity and Maxus, the unidentified individual and companies self-reported their identities to ADHS.  For the limited proceedings before it, the Court notes that ADHS has not contested the fact that the allegation in the criminal information does not concern the quality of care or treatment Trinity and Maxus rendered to patients or Trinity and Maxus's day-to-day handling and management of Medicaid funds.

Trinity and Maxus also argue that the public interest weighs in favor of entering a temporary restraining order because of the concerns of their patients.  Trinity and Maxus claim that the state of Arkansas is suffering from a shortage of Medicaid sponsored psychiatric treatment facilities and that "abruptly ceasing operations of [Trinity and Maxus] will be devastating to those individuals relying on the treatment [that Trinity and Maxus] provide" (Dkt. No. 3, at 13).  A third affidavit by Dr. Stinnett indicates that Trinity "services a large portion of rural Arkansas" and indicates that Dr. Stinnett "is not aware of another Medicaid-accredited facility similar to Trinity that could accommodate Trinity's current population of patients" (Dkt. No. 3, Ex. D, ¶ 17).  Trinity and Maxus argue that, as a result of the suspended Medicaid payments and the likely closing of Trinity and Maxus's operations, their patients "will be forced to endure an abrupt removal from their current treatment facilities" (Dkt. No. 3, at 29).  Moreover, Dr. Stinnett states that the "transfer of juvenile and adult patients from Maxus' [sic] outpatient counseling clinics will cause emotional trauma to a significant portion of Maxus' outpatient population and may result in negative therapeutic regression" (Dkt. No. 3, Ex. D, ¶ 25).

Furthermore, Trinity and Maxus argue that a suspension of their Medicaid payments will significantly harm the state's Medicaid program.  Trinity and Maxus allege that suspending their Medicaid payments will undermine their patients' treatment and that, after Trinity and Maxus close, the "current psychiatric system will likely be unable to absorb [their] 2,600 patients" (Dkt. No. 3, at 22).  Trinity contends that, if it is forced to close, the state will experience a 15% reduction in inpatient beds available to juvenile patients in need of psychiatric care.  Dr. Stinnett's affidavits indicate that the Arkansas Health Services Permit Agency has reported that 628 beds for psychiatric residential treatment exist in Arkansas; that 92 of these beds are

Trinity's; and that the current statewide need for such beds includes 634 patients, six more patients than the amount of beds available without even subtracting Trinity's 92 beds (Dkt. No. 3, Ex. C at ¶¶ 13-14).

At the November 7, 2014, hearing, ADHS submitted a statement from Nicole May, who is the Vice President of Arkansas Value Options, the peer review organization for the Department of Human Services.  Ms. May's statement was unsworn, but the parties stipulated that, because Ms. May was available to testify at the hearing, the parties would not contest the unsworn nature of the statement.  Ms. May states that Value Options "reviews services provided by Maxus and Trinity Behavioral."   Ms. May states that "there are 26 Arkansas Medicaid enrolled inpatient psychiatric facilities who report having 84 residential treatment beds available for use in transferring beneficiaries who are currently served by Trinity . . . ." (Statement of Nicole May, at 1).  Ms. May also notes that Value Options has reached out to guardians of 86 Medicaid beneficiaries who are receiving treatment at Trinity and that Value Options has contacted 64 of these guardians.  According to Ms. May, 24 of these guardians discharged the beneficiaries home; 15 "reported a wish to transfer"; 15 reported their beneficiaries had returned home already; 4 were undecided; and 21 were going to continue services at Trinity.

The Court notes that Ms. May does not dispute that there are more Medicaid patients in need of inpatient behavioral services than there are beds available in the State of Arkansas.  Furthermore, she notes that "Arkansas Medicaid identified 86" patients from Trinity but that only 84 residential treatment beds are available at the other 26 inpatient psychiatric facilities.  Ms. May does not indicate where these 26 facilities are located in Arkansas.  Furthermore, the Court notes that ADHS initial communications to Trinity and Maxus regarding their suspensions acknowledged that a "large number of beneficiaries [will] be impacted by this action" (Dkt. No.

8

1, Ex. A). Accordingly, ADHS only suspended new inpatient admissions and new outpatient beneficiaries as of the date of the October 7, 2014, letter. ADHS has presented no reason why such a partial suspension of Medicaid payments cannot remain in effect longer than the 30 days initially set forth by ADHS to accommodate the large number of beneficiaries that remain in need of Trinity and Maxus's services.

The Court must examine its case in the context of the relative injuries to the parties and to the public. *Dataphase*, 640 F.2d at 114. After balancing these equities, and based on the limited information and allegations before it, the Court finds that because any suspension of Medicaid payments will cause all of Trinity and Maxus's services to halt, resulting in potentially devastating consequences to residential patients who may have nowhere else to go for psychiatric care and resulting in economic hardships for those employed by Trinity and Maxus in these underserved communities of the state, and because the quality of Trinity and Maxus's care does not appear to be questioned by ADHS or other officials at this time, the resulting harm to Trinity and Maxus and their patients is greater than the potential harm to defendants' administrative process and the investigation concerning the allegation of fraud. At this stage of the proceedings, the Court finds that the threat of irreparable harm to Trinity and Maxus and the public interest outweighs the immediate interests and potential injuries to ADHS.

### 3. Likelihood Of Success On The Merits

The Eighth Circuit has emphasized that courts are to apply the *Dataphase* factors flexibly and that no one factor is controlling. *See Aswegan*, 981 F.2d at 314. Furthermore, other courts have noted that in assessing the likelihood of success on the merits, this factor may be "somewhat relaxed" if the "three harm factors" tip in a claimant's favor. *Peak Med. Oklahoma No. 5, Inc. v. Sebelius*, No. 10-CV-597-TCK-PJC, 2010 WL 4809319, at *2 (N.D. Okla. Nov. 18, 2010) (quoting *F.T.C. v. Mainstream Marketing Services, Inc.*, 345 F.3d 850, 852 (10th Cir.

2003)).    Thus, "[u]nder such circumstances, 'probability of success is demonstrated when the [movant] has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation.'" *Id.*

In this case, Trinity and Maxus have alleged several claims that involve the complex interaction of state agencies, federal regulations, and constitutional rights.   ADHS, though contesting these claims, has alluded to potentially difficult and novel regulatory issues which, at this point, ADHS has not had the opportunity to brief fully.   Therefore, considering the necessary flexibility of the *Dataphase* factors and Trinity and Maxus's showing of a threat of irreparable harm to them and to the public's interest that outweighs the potential injury to ADHS, the Court determines that Trinity and Maxus have demonstrated a probability of success on the merits by raising novel, serious, substantial, and potentially difficult questions about the merits of their claims.

## III.    Status Quo

Given the date that Trinity and Maxus filed their challenge to ADHS's determination, and given the arguments advanced by Trinity and Maxus, this Court determines that the status quo is not defined as Trinity and Maxus suggest in their filings with this Court.   Instead, this Court determines that the status quo is the situation that existed at Trinity and Maxus on November 5, 2014, whereby ADHS has suspended Medicaid payments for new patients at Trinity and Maxus but agreed to continue to make payments for care rendered to existing Medicaid patients treated by Trinity and Maxus.

## IV.    Security

Under Federal Rule of Civil Procedure 65(c), a district court may grant a temporary restraining order "only if the movant gives security in an amount that the court considers proper

to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).  In these proceedings, ADHS has neither requested security in the event this Court grants a temporary restraining order nor has it presented any evidence that it will be financially harmed if it were wrongfully enjoined.  Further, this Court does not perceive how ADHS could be harmed by reimbursing Trinity and Maxus for services provided to Medicaid patients, considering that ADHS willingly agreed to pay until November 6, 2014, Trinity and Maxus for the care they provided to these patients and that ADHS would have to pay the same amount for benefits of these patients regardless of who their Medicaid provider happens to be after November 6, 2014.  For these reasons, the Court declines to require security from Trinity and Maxus.

### V.      Conclusion

For the foregoing reasons, the Court determines that Trinity and Maxus have met their initial burden for a temporary restraining order to maintain the status quo.  Therefore, the Court grants in part Trinity and Maxus's motion for temporary restraining order.  The Court temporarily restrains ADHS for a period of 14 days from the date of entry of this order from suspending Medicaid payments to Trinity and Maxus for services rendered to inpatient and outpatient Medicaid beneficiaries.  ADHS may continue its suspension for any new inpatient admissions and for any new outpatient beneficiaries.  Pursuant to Federal Rule of Civil Procedure 65(b)(2), this temporary restraining order shall not exceed 14 days from the date of entry of this order.

SO ORDERED this 7th day of November, 2014, at 5:00 p.m.

_____
Kristine G. Baker
United States District Judge