# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS

| | |
|---|---|
| Trinity Behavioral Health Care System, Inc., and Maxus, Inc., | |
| Plaintiffs | |
| v. | Case No. 4:14-cv-00651 KGB |
| Arkansas Department of Human Services, John Selig, in his individual capacity and in his official capacity as Director of the Arkansas Department of Human Services, and Dawn Stehle in her individual capacity as Director of the Division of Medical Services of the Arkansas Department of Human Service | District Judge Kristine G. Baker |
| Defendants. | |

## REPLY BRIEF IN SUPPORT OF PRELIMINARY INJUNCTION

Plaintiffs Trinity Health Care System, Inc. ("Trinity") and Maxus, Inc. ("Maxus") (collectively "Plaintiffs" or "Providers") respectfully submit their reply brief in support of their request for a Preliminary Injunction and state as follows:

## Introduction

In their Memorandum in Support of their Motion for a Temporary Restraining Order (the "Memo") and their Supplemental Brief in Support (the "Supplement"), Plaintiffs established that they have a likelihood of success on the merits of their claims and that they, and the thousands of patients they treat, will experience substantial irreparable harm in the absence of an injunction. Further, Plaintiffs explained that the suspension was improper and should be reversed because:

- The Arkansas Department of Human Services ("DHS") did not have the authority under the law to suspend Plaintiffs' Medicaid payments;

11/17/14

1

- 42 C.F.R. § 455.23 does not apply to this case because there have been no allegations of *financial fraud* relating to the Medicaid program;

- there are no allegations that the alleged bribery at issue was related to either of the Plaintiffs, let alone both;

- DHS did nothing to independently verify the allegations upon which the suspension is purportedly based; and because

- good cause exists not to suspend payments.

In their Response, Defendants do not dispute ***any*** of the following points:

- that the Medicaid Inspector has the authority to pursue civil and administrative remedies and has the explicit duty to prevent, detect, and investigate fraud and abuse;

- that the allegations at issue do not involve any financial fraud or that any Medicaid funds would be placed at risk if Plaintiffs' payments were permitted to continue;

- that DHS failed to conduct any investigation or  independently verify the allegations at issue;

- that the thousands of patients receiving treatment at Plaintiffs' facilities have a due process right to continued Medicaid treatment;

- that Plaintiffs serve patients living in designated Medically Underserved Areas;

- that the suspension will put Plaintiffs out of business before a hearing is held;

- that the patients will experience regression in their therapeutic treatment and their education if they are abruptly and unnecessarily removed from Plaintiffs' care.

Despite conceding these points, Defendants nonetheless argue that injunctive relief should be denied because they contend DHS properly suspended Plaintiffs' payments. Defendants have cited absolutely no support for their claim that section 455.23 even applies in this case.  Furthermore, Defendants' position completely ignores the real and substantial harm that will be inflicted upon the thousands of Medicaid patients at issue if an injunction is not

11/17/14

2

granted.    Accordingly, as set forth in detail in Plaintiffs' Memorandum of Law, their Supplemental Brief, and this Reply, this Court should grant Plaintiffs' Motion and extend the injunction.

## <u>Argument</u>

The four factors to consider when determining whether to grant injunctive relief are "flexible and interrelated."  *Dataphase Systems, Inc. v. CL Systems, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981); *see also Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 102 (6th Cir. 1982) ("Although these four factors guide the discretion of the district court, they do not establish a rigid and comprehensive test for determining the appropriateness of preliminary injunctive relief.  A fixed legal standard is not the essence of equity jurisprudence.").  A movant need not succeed on every factor in order to be entitled to an injunction.  *See Six Clinics Holding Corp. v. Cafcomp Sys. Inc.*, 119 F.3d 393, 400 (6th Cir. 1997) ("a finding that the movant has not established a strong probability of success on the merits will not preclude a court from exercising its discretion to issue a preliminary injunction if the movant has, at minimum, show[n] serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if the injunction is issued.").  An overwhelming showing of any one element may compensate for another.  *Id.*

In this case there is overwhelming evidence that Plaintiffs and Plaintiffs' patients will suffer significant irreparable harm.  Therefore, only a minimal showing of success on the merits is necessary.  Further, in order to grant the preliminary injunction, the Court need find a likelihood of success on only one of Plaintiffs' claims.  Stated differently, if the Court determines Plaintiffs' likelihood of success as to any of its causes of action or arguments and that there is a threat of irreparable harm, the preliminary injunction should be granted.

11/17/14

## I.      Plaintiffs Have A Likelihood Of Success On The Merits

   A.      *Suspension Will Be Overturned Because DHS Lacks The Authority To Issue Medicaid Payment Suspensions.*

As of July 1, 2013, the Arkansas Office of Medicaid Inspector General ("OMIG") is the only agency with the proper delegated authority to investigate allegations of fraud and enforce sanctions against providers, inclusive of suspending Medicaid payments.  *See* A.C.A 20-77-2505, A.C.A. 20-77-2506, and A.C.A. 20-77-2508.   As state agencies, OMIG and DHS are "creatures of the state" and have only the powers conferred to them by Arkansas-state statute. *Brookshire v. Adcock*, 2009 Ark. 207 (Ark. 2009).   OMIG, and not DHS, is the Arkansas state agency that shall, "[p]revent, detect, and investigate fraud and abuse within the medical assistance program."  A.C.A. 20-77-2505.  To carry out this authority, OMIG has "the ability, authority, and resources to pursue administrative sanctions and liquidated damages to protect the fiscal and programmatic integrity of the medical assistance programs from health care providers and other persons who engage in fraud, misrepresentation, abuse, or other ill practices."  A.C.A. 20-77-1304.  Additionally, OMIG may "[p]ursue civil and administrative enforcement actions against an individual or entity that engages in fraud, abuse, or illegal or improper acts within the medical assistance program, including without limitation: . . . (ii) Withholding payment of medical assistance funds in accordance with state laws and rules and federal laws and regulations."  A.C.A. 20-77-2506.  Arkansas statutory intent is clear and unambiguous in its delegation of authority to OMIG to suspend Medicaid payments to providers in circumstances involving allegations of fraud.  As previously cited, OMIG maintains this power under any relevant state law or regulation, or federal law or regulation, including 42 C.F.R. § 455.23.

The alleged statutory authority relied upon by DHS to support its claim that it had proper

11/17/14

authority to issue a suspension is unreasonable as it only references vague and generic language giving it the authority to "[a]dminister assigned forms of public assistance," to "establish a program to provide for long-term care," to "establish and maintain an indigent medical care program," and "to provide for continued coverage of prescription drugs under the Title XIX Medicaid Program for the State of Arkansas." A.C.A. 20-76-201(1), A.C.A. 20-77-102, A.C.A. 20-77-107, and A.C.A. 20-77-402. Furthermore, all of the cases cited by DHS in support of its position were all decided prior to the creation of OMIG and its assumption of DHS' prior authority to suspend Medicaid payments in instances of allegations of fraud.

DHS wrongly claims that its authority and obligation to suspend payments arises from federal law, and any state law to the contrary is preempted.  This argument fails, because without corresponding state statutory authority, federal law cannot dictate the actions of a state agency. *New York v. United States*, 505 U.S. 144 (1992).  In *New York*, the Supreme Court held "that even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts." *Id.*  DHS' own argument illustrates this point by alleging that they are the only agency empowered by federal regulation, 42 C.F.R. § 455.23 specifically, to suspend Medicaid payments in instances of alleged provider fraud because they are the "State Medicaid agency." Federal regulation does not mandate DHS suspend payments; rather, in order to receive federal Medicaid related funds, Arkansas must designate a "State Medicaid agency" to do so. *See* 42 U.S.C.A 1396b(i)(2), and 42 U.S.C.A. 1396a(a)(5).  In *New York*, the Supreme Court stated, "[w]here the recipient of federal funds is a State, as is not unusual today, the conditions attached to the funds by Congress may influence a State's legislative choices."  505 U.S. 144.  Affirmed by the U.S. Supreme Court and highlighted by the state's ability to designate an agency, it is the

5

state that ultimately decides which agency will suspend Medicaid payments, and as discussed above, Arkansas state statute delegates such authority to OMIG.

DHS asserts that it is the designated "State Medicaid agency" in Arkansas.   A state agency is named the "State Medicaid agency" through the state's "State Plan," and an approved "State Plan" is required in order for a state to receive federal Medicaid funds.   42 C.F.R. 430.10 and 42 C.F.R. 431.10.   Another mandatory element of the State Plan is that it will be amended "whenever necessary to reflect – … (ii)[m]aterial changes in State law, organization, or policy, or in the State's operation of the Medicaid program." 42 C.F.R. 430.12(c). Any claim that DHS is the "State Medicaid agency" because of references to it in the current Arkansas "State Plan", and that designation coupled with the requirement that the "State Medicaid agency" suspend payments under federal regulation, would preempt state statute is without merit.   Federal law explicitly requires an amendment of the "State Plan" following a change in state law, and DHS cannot rely on its reference as the "State Medicaid agency" simply because the state has delayed amending the "State Plan."

In sum, this is not a preemption issue.   The state had the power to delegate authority to OMIG to suspend Medicaid payments in instances of alleged provider fraud without conflicting with any federal law or rule, and Medicaid providers are bound by state law.   In order to receive federal Medicaid funds, the state must comply with federal law and amend its "State Plan" accordingly.   The fact that it has not done so does not impact the validity of state law.

Because DHS issued a suspension of Plaintiffs' Medicaid payments without any statutory authority to do so, the purported suspension is invalid.   OMIG has clear and specific statutory authority to suspend Medicaid payments with no issue subject to preemption by federal law. Accordingly, Plaintiffs have a substantial likelihood of success on their claim that the suspension

11/17/14

6

should be reversed.

      B.      *Suspension Will Be Overturned Because 42 C.F.R. § 455.23 Does Not Apply.*

            i.      <u>42 C.F.R. 455.23 Doesn't Apply Because The Allegations Do Not Relate To Financial Fraud.</u>

In their Supplemental Brief, Plaintiffs provided additional support demonstrating that the regulation that Defendants are relying on to issue the suspension, 42 C.F.R. § 455.23, only applies in circumstances where the fraud alleged is related to Medicaid financial fraud.  (*See* D.E. #11).   Specifically, Plaintiffs explained that the purpose of 42 C.F.R. §455.23 is to "safeguard Medicaid dollars and to protect Medicaid program beneficiaries" and that under the federal regulations, "any fraud or willful misrepresentation that serves as the basis for the withholding of payments [pursuant to §455.23] ***must be related specifically to monies obtained under the Medicaid program***."  52 FR 48814-01, \*48815-17.  Federal law is clear on this issue. Allegations of fraud that are "unrelated" to Medicaid funds, "such as deceptive advertising, should not be the basis for withholding payments" under §455.23.  (52 FR 48814-01, \*48815).

Defendants do not deny that the allegations at issue here do not involve financial fraud. Defendants do not deny that there have been **no** allegations of improper billing or conversion of Medicaid funds.  Defendants do not deny that Medicaid funds would not be placed at risk if the suspension were lifted and Plaintiffs continued to receive their Medicaid reimbursements.   In sum, Defendants do not deny that the alleged basis for the suspension is not related to monies obtained under the Medicaid program whatsoever.  Defendants' position that 42 C.F.R. § 455.23 applies in this case is simply unsupported by authority or the facts.  Defendants have not cited nor could Plaintiffs locate even a single case in which § 455.23 was applied in instances where the fraud alleged was anything other than Medicaid financial fraud.

11/17/14

Defendants' argument that under Plaintiffs' theory, a provider using a fake provider number could not be suspended is misleading.  It is not Plaintiffs' position that such conduct could not support a suspension, termination, or other sanction.  Rather, it is Plaintiffs' position that suspension in these circumstances would not be appropriate under §455.23 as this section is limited in its purposes to address Medicaid financial fraud only.  There are numerous other mechanisms at DHS' disposal to address the hypothetical fake provider number fraud.  As Plaintiffs explained in their Supplement, section 455.23 simply does not support suspension of Medicaid funds whenever any type of fraud is alleged.  To hold otherwise would lead to absurd results.[1]

Defendants have offered no support for their position that 42. C.F.R. § 455.23 applies in this case in stark contrast to the ample support provided by Plaintiffs for their position that the regulation does not apply.  As such, it is likely that Plaintiffs will succeed on their claims that the 42 C.F.R. §455.23 is not applicable to the facts at issue.

    ii.    <u>42 C.F.R. §455.23 Does Not Apply Because The Alleged Actions By Plaintiffs' Owner Are Not Attributable to Plaintiffs or Related To The Medicaid Program.</u>

The allegations upon which DHS based the suspension are that Plaintiffs' owner gave cash to a DHS officer in return for "information" intended to benefit Plaintiffs.  In response to Plaintiffs' arguments that there is no connection between the alleged acts of the Plaintiffs' owner and Plaintiffs here, Defendants simply reference an allegation of the U.S. Attorney that Plaintiffs owner and others engaged in illegal actions for the purpose of enriching themselves and to

---

[1] In their Supplement, Plaintiffs demonstrated the point with the example of a Medicaid provider who, in connection with personal dealings, is alleged to have issued a bad check thereby committing fraud.  Allegations of fraud in this respect are entirely outside the purview of 42 C.F.R. 455.23.

11/17/14

advance Plaintiffs' business interests and argue that actions taken by the Plaintiffs' owner "should be attributable to Plaintiffs." (D.E #12, p.7).

Defendants are mistaken.  First, long-established corporate law is clear that legally, a corporate entity and its individual owner are separate legal beings and the actions of one are not necessarily attributable to the other.   Second, Defendants' position relies solely on an unsupported conclusion.  Defendants simply conclude that the alleged conduct was taken to "advance Plaintiffs' business interests," and they do not put forth *any facts* that support this claim.  Despite having ample opportunity to have done so, Defendants have never disclosed what information they even believe Plaintiffs' owner obtained let alone how that alleged information may have been benefitted Plaintiffs in any respect.  Instead, they want this Court to allow the destruction of two local companies and displace thousands of Medicaid patients based solely on a vague allegation and conclusive hyperbole that *some* information relating to some unknown conspiracy was received.  In the absence of any factual allegations to even *suggest* that the *Plaintiffs* (not simply Plaintiffs' owner) committed fraudulent conduct relating to their Medicaid business, suspending Plaintiffs' Medicaid payments is entirely unwarranted and should be reversed.  As such, Plaintiffs have demonstrated a likelihood of success and an injunction is proper.

C.      *The Suspension Will Be Overturned Because Defendants' Failed To Independently Verify The Allegations.*

In order to suspend a provider's Medicaid payments under 42 C.F.R. § 455.23(a), the appropriate agency must *first* determine there are "credible allegations of fraud."  (*See* D.E. # 3, p. 18-19).  Under federal law, an allegation is credible when it has been "verified by the state" and when the state has "review[ed] all allegations, facts, and evidence carefully."  42 C.F.R.

11/17/14

§455.2.  Defendants in this case concede that they did not conduct *any* independent investigation of the allegations.  (*See* D.E. # 12, p. 6).  Defendants argue that they are not required to do any investigation and that they can issue payment suspension based exclusively on allegations contained in plea agreement documents.  Defendants do not cite any authority for this position nor do they reconcile this with express federal instruction that states are *not* to rely on a singular allegation in issuing a suspension and that states should "review all allegations, facts, and evidence carefully and act judiciously on a case-by-case basis."

These federal mandates are in place to protect Medicaid providers and beneficiaries from "false allegations" and to avoid the "dire consequences" of suspension.  *See* 76 F.R. 599, p. 5933.  In fact, the U.S. Department of Health and Human Services has explicitly recognized "the hardship that can be placed on a number of program beneficiaries and on certain types of providers that service a large percentage of [Medicaid recipients] as a results of any withholding action" and noted that "[w]hile these providers will still be free to treat and receive reimbursements from private-pay patients, [states should] proceed cautiously to assure that providers of this type are not subject to payment suspension ***until such action is clearly necessary.***"  52 FR 48814-01, *48816.

Because DHS failed to conduct any objective review or independent verification of the allegations and failed to conduct any investigation into the facts and evidence prior to issuing the suspension of Appellants' Medicaid payments, the suspension was not issued in response to a "credible allegation," is not consistent with federal law, and should be reversed.  Plaintiffs, therefore, have a likelihood of success on this claim.

11/17/14

D.    *The Suspension Will Be Overturned Because Good Cause Exists*

In their Supplemental Response, Defendants misquote the Social Security Act in order to conceal the fact that good cause clearly exists here to not suspend Plaintiffs' Medicaid payments. Defendants incorrectly argue that the statute requires that in order to apply the Medically Underserved Good Cause Exception, the State must first make an official determination that beneficiaries' access to items or services would be jeopardized.  (*See* D.E. 12, p. 16).  Despite Defendants' disingenuous recitation of the statute, this requirement is simply not found under the law.  Rather, the statute provides that "a State may find that good cause exists not to suspend payments . . . if ***any*** of the following are applicable:

* * *

(2)    Other available remedies implemented by the State more effectively or quickly protect Medicaid funds.

* * *

(4)    Beneficiary access to items or services would be jeopardized by a payment suspension because of either of the following:

(i)    An individual or entity is the sole community physician or the sole source of essential specialized services in a community.

(ii)    The individual or entity serves a large number of beneficiaries within a HRSA-designated medically underserved area.

* * *

(6)    The State determines that payment suspension is not in the best interests of the Medicaid program.

11/17/14

11

Nowhere in the text of the statute is it required that the state first make a determination that access to items or services would be jeopardized before a finding of good cause to not suspend payments can be made.  Rather, the drafters of the statute acknowledge that if an entity serves a large number of beneficiaries in an HRSA-designated zone, it follows that beneficiaries' access to items and services would be limited by that providers' suspension such that good cause likely exists to not suspend payments.

In fact, the U.S. Department of Health and Human Services (the "USDHS") explained the rationale behind this good cause exception and its explanation demonstrates precisely why the exception is directly implicated in this case.  In issuing commentary relating to the suspension regulation, the USDHS specifically addressed "a number of commenters" who were concerned about facilities whose patient populations were primarily Medicaid recipients (such as Trinity and Maxus).  (52 FR 48814-01, *48816).  The concern was that "to withhold all Medicaid payments to providers of this type could essentially put these facilities out of business, causing hardship to the Medicaid beneficiaries as well."  (*Id*).  In response to these concerns, the USDHS specifically "recognize[d] the hardship that can be placed on a number of program beneficiaries and on certain types of providers that service a large percentage of these individuals as a result of any withholding action."  (*Id.*).  The USDHS noted it is "mindful of the potential impact of any withholding action against these types of providers and ***expects States to proceed cautiously to assure that providers of this type are not subject to payment suspension until such action is clearly necessary.***" (*Id*).

Defendants want this Court to ignore the text of the statute and the instruction of the USDHS and find that they may exercise their discretion in any manner whatsoever even if it means misapplying a statute that is not implicated in this case and refusing the apply good cause

12

exceptions that are clearly implicated.  Defendants want this Court to endorse their actions even when exercising their discretion in this manner will force two Arkansas companies out of business immediately and will impose severe hardship on numerous Arkansas Medicaid beneficiaries. Neither the spirit nor text of the Medicaid statutes and regulations support this unfettered and reckless discretion.  As such, Plaintiffs have a strong likelihood of success on the merits of their claim.

E.      *The Suspension Will Be Overturned Because It Violates The Equal Access Provision and the Best Interests Provision.*

It is indisputable that the federal government, in soliciting states' participation in the Medicaid program, intended that states would operate the program in such a manner that would ensure indigent citizens would have access to the type and quality of services available to the general public.  The Equal Access and Best Interests Provisions were promulgated to address this precise concern.   Nonetheless, Defendants advocate that this Court should reject Plaintiffs' argument that suspension will be reversed because the effect of the suspension will be to deny beneficiaries' equal access to treatment, as the law requires.    Defendants argue that the beneficiaries' best interests and access to treatment should be secondary to the state's obligation to "protect the integrity of the program" (42 U.S.C. 1396a(a)(69)) and that the Equal Access Provision requires only that reimbursement rates are set at a sufficient level.  Defendants are wrong.

As discussed at length above, the integrity of the Medicaid program is not at risk here. The vague allegations of fraud that have been asserted do not include any facts suggesting the Medicaid program is in any way involved in the alleged conspiracy.  As such, the integrity of the program is not in jeopardy and section 1396a(a)(69) is not implicated.  Further, even if it were,

the primary objective of the Medicaid program is to provide necessary medical care to indigent state citizens.  It is unreasonable for Defendants to argue that the purpose of the equal access and best interests provision should be ignored in favor of other provisions or that the equal access provision should apply only to regulate reimbursement rates.   The rationale behind the equal access provision clearly applies more broadly to order to ensure enough providers exist within the state to properly serve Medicaid beneficiaries.

Defendants' hyperbolic claim that if this Court adopts Plaintiffs' position, that suspension would never be justified because beneficiaries will always be "indirectly impacted" is nonsensical.  Plaintiffs do not argue that any suspension of Medicaid payments is per se a violation of federal law, but rather that prior to issuing a suspension, DHS must first consider the suspension's effect on the availability of medical services for the Medicaid beneficiaries and whether the suspension would further their best interests.  This is particularly true when, as is the case here, there is *no* allegation that Medicaid funds are in jeopardy, and more importantly, *no* allegation that patients' health, safety, or welfare are in jeopardy.

Plaintiffs have provided the Court with significant evidence that thousands of patients are at risk of being denied access to critical medical care unless the suspension is overturned. Accordingly, Plaintiffs have a substantial likelihood of success on their claims.

F.      *Plaintiffs Will Succeed On Their Due Process Claims*

Defendants claim that Plaintiffs do not have a likelihood of success on the merits because Plaintiffs do not have a property or liberty right that requires that they be afforded due process. Defendants' argument is wrong because Plaintiffs do have a liberty right at stake, therefore they are entitled to due process. The ninth circuit in a Medicare suspension case previously found that a physician accused of submitting false Medicare reimbursements has a

liberty interest and therefore, is entitled to due process.  See *Erickson v. U.S. ex rel. Dept. of Health and Human Services*,  67 F.3d 858 (9th Cir. 1995).  The *Erickson* court specifically found that the Plaintiff there did have a liberty because the charge by the government impaired the plaintiff's reputation for honestly and morality.  *Id*. at 862.  The *Erickson* court ultimately found that the Plaintiff's due process rights were not violated and therefore reversed the district court's granting of a TRO and a permanent injunction ruling.  In making its ruling regarding whether a liberty interest exists, the  Ninth Circuit set forth a three part test to determine if  a liberty interest exists.  The Ninth Circuit stated, "The procedural protection of due process apply if the accuracy of the charge is contested, there is some public disclosure of the charge, and it is made in connection with the termination of employment or the alteration of  some right or status recognized."

Each of these the above elements are present in this case therefore Plaintiffs do have a likelihood of succeeding on their due process claim.  First, Plaintiffs absolutely contest the accuracy of the charge.  In numerous briefs before this court the Plaintiffs have challenged that the allegations against them were credible, that the charges were related to the providers and that the charges did not implicate the statue at issue.  Second, there is no doubt that the allegations have been published as letters were sent to the patients of the Providers indicating that Providers Medicaid payments were suspended.  (*See* DHS Letter to patients attached hereto as **Exhibit 1**).  Finally, the charge was made in connection with the suspension of Medicaid benefits.  Thus all of the factors necessary of a liberty interest to exist are present in this case as they were in the *Erikson* case.   Therefore, the Plaintiffs are likely to succeed on their due process claim regarding the suspension.

15

11/17/14

G.      *Plaintiffs Will Succeed On The Patients' Due Process Claims.*

In their Complaint, Motion, Memorandum and Supplement, Plaintiffs alleged that the suspension, if permitted to take effect before a full and fair hearing on the merits, would violate the due process rights of the patients receiving treatment at Plaintiffs' facilities.  *Nowhere* in Defendants' Response or Supplement do Defendants even address these patients' rights.  This alone should be sufficient to find a likelihood of success in Plaintiffs' favor on this issue. Plaintiffs will not repeat their arguments here but submit that they have demonstrated a likelihood of success on their claim that federal law requires that the suspension be held in abeyance until after a full hearing is conducted.  *See Kapable Kids Learning Center Inc. v. Arkansas Dep't of Human Services*, 420 F. Supp. 2d 956, 961 (E.D. Ark. 2005) (stating the court's issuance of an injunction suspending certain Medicaid payment changes comported with due process requirements and allowed the state to remain in compliance with the equal access provision pending further review of the proposed change).

To the extent Defendants are arguing that the patients' rights are sufficiently protected because there are alternative treatment centers available, Defendants are relying on a faulty premise.  The affidavits Defendants have submitted state as support are based on incomplete and misleading information, are contrary to the federal statistics referenced by Plaintiffs in their initial briefs and supporting affidavits and are specifically rebutted the affidavits of Eric Etchison  and Rhonda Lynk Pearson attached hereto as **Exhibits 2 and 3.**

For example DHS' affiant Bridget Atkins implies in her affidavit that there are alternative treatment facilities available to absorb Maxus' more than 2000 outpatients. Specifically, Ms. Atkins states there are at least two other certified RSPMI sites, operated by other providers, in all of the counties Maxus operates.  (*See* Atkins Affidavit at ¶ 4.).  However, Ms. Atkin's affidavit

16

11/17/14

does not indicate whether any of the other certified RSPMI sites have capacity, staffing, facilities and service providers that are adequate to absorb and treat Maxus patients in each of the counties where Maxus is currently providing treatment.  She states only that other RSPMI sites exist. Plaintiffs' affiant affirmatively states that there is not adequate capacity to absorb all of Maxus patients.  (*See* Exh. 2 and 3).  Ms. Atkin's affidavit also does not address geographic proximity of the "alternative" providers.  The majority of Maxus' patients have limited financial resources. The transportation options that exist in the mostly rural counties that Maxus operates are very limited.  Requiring patients to travel for treatment, even small distances further than they are currently traveling, will unreasonably put patients' at risk of having to forgo obtaining necessary treatment.  In fact, only a small percentage of Maxus patients have transferred to alternative facilities further confirming that there is not adequate alternative treatment is the fact that only.

Much of the information provided in DHS's affiant Nicole May affidavit is similarly incomplete and inaccurate.  For example, the affidavit of Ms. May details the number of providers from which the current beneficiaries of Trinity have received treatment. (D.E. #12, Exh. 2 at ¶6a-j.)  It appears that Ms. May is suggesting, by setting forth this information (although she does not state this), that patients of Trinity will not be traumatized by transfer from Trinity because they have treated with multiple providers.  Ms. May's assumption set forth above is incorrect.  The fact that patients have had multiple providers in the past does not suggest that changes in their current treatment environment will not have serious adverse effects to their mental health.  Importantly, a juvenile with psychiatric conditions, like patients at Trinity, are particularly susceptible to trauma based upon transfer of providers and treatment placement regardless of the number of treatment providers they had previously seen for treatment.

Additionally, the number of previous providers is not a significant factor in determining

17

whether patients will be traumatized as a result of a psychiatric provider transfer.  Significant factors determining whether a patient will be traumatized as a result of transfer include, time at the patient facility, conditions prior to being placed at the current facility, type of psychiatric illness, and age of the patient.  Ms. May's affidavit is factually inaccurate regarding the amount of beds available for inpatients. Ms. May states in her affidavit, "As of November 10, 2014, there were 64 open residential beds in Arkansas or bordering cities.   However, only 48 of these open residential beds were currently needed for possible placement for Arkansas Medical beneficiaries remaining at Trinity."  (D.E. #12, Exh. 12 at ¶7.)

May's affidavit does not indicate the type of facilities in which the available beds are located.  Trinity patients are currently in a residential setting that is specifically tailored to treat juveniles.  There is no mention in the May affidavit whether the available beds are in adult psychiatric hospitals, adult medical hospitals or other types of facilities.  Ms. May states in her affidavit, "As of November 10, 2014, there were 64 open residential beds in Arkansas or bordering cities.   However, only 48 of these open residential beds were currently needed for possible placement for Arkansas Medical beneficiaries remaining at Trinity."  (*Id.*  ¶7.)

May's affidavit does not indicate the type of facilities in which the available beds are located.  Trinity patients are currently in a residential setting that is specifically tailored to treat juveniles.  There is no mention in the May affidavit whether the available beds are in adult psychiatric hospitals, adult medical hospitals or other types of facilities.

For all of these reasons, Defendants' claim that the patients' due process rights are not implicated because there are alternative treatment providers should be rejected by this Court. *See Spivey v. Barry*, 665 F.2d 1222, 1228 (C.A.D.C. 1981) (noting that "transfer of patients to a facility with inferior services . . . would invoke constitutional procedural protections.").

11/17/14

II. **Plaintiffs and their Patients Will Suffer Irreparable Harm In The Absence of an Injunction.**

      A. *Plaintiffs' Irreparable Harm*

In granting Plaintiffs' Motion for a Temporary Restraining Order, this Court found that Plaintiffs provided factual support for their claim that they will experience irreparable harm if their Medicaid payments were suspended prior to the resolution of the administrative appeal. (D.E. # 9, p. 5). Further, the Court noted that DHS had "not contested Trinity and Maxus' claims that a suspension of their Medicaid payments will result in these facilities closing their operations and that these damages cannot be compensated adequately through an action for money damages." (*Id.*). As such, the Court found that Plaintiffs had "sufficiently shown that, without a temporary restraining order to preserve the status quo, they will likely suffer irreparable harm."

The Defendants' Supplement again does not contest Plaintiffs' claims that a suspension will result in Plaintiffs' closure or that these damages cannot be compensated adequately through an action for money damages. As such, Plaintiffs have sufficiently demonstrated they will likely suffer irreparable harm in the absence of an injunction and the Court's prior ruling on this point should stand.

      B. *Patients' Irreparable Harm*

Defendants have not offered any evidence rebutting the threat of transfer trauma the patients will likely experience in the absence of an injunction in this case. *See supra* p. 16-18.

III. **Balance of Equities**

In issuing the Temporary Restraining Order in this case, this Court found that "because any suspension of Medicaid payments will cause all of Trinity and Maxus' services to halt,

11/17/14

19

resulting in potentially devastating consequences to residential patients who may have nowhere else to go for psychiatric care and resulting in economic hardships for those employed by Trinity and Maxus in these underserved communities of the state, and because the quality of Trinity and Maxus' care does not appear to be questioned by ADHS or other officials at this time, the resulting harm to Trinity and Maxus and their patients is greater than the potential harm to defendants' administrative process and the investigation concerning the allegations of fraud." (D.E. #9, p. 9).  Nothing in Defendants' Supplement calls into question the Court's finding on this element.  Defendants have not identified any injury they may suffer if an injunction is granted.  Accordingly, the balance of equities clearly favors Plaintiffs and an injunction is warranted under the circumstances.

## IV.     Public Interest

The only public interest Defendants identified in support of their position that injunctive relief should be denied is the "preservation of public funds" and "compliance with federal regulations."  (D.E. # 12, p. 17).  Neither interest is even implicated here because, as discussed above, there are no allegations that public funds are at risk and section 455.23 of the federal regulations does *not* mandate Defendants' suspend payments in this case.  Even if either of these interests were at issue here, which they are not, neither is sufficient to overcome the compelling public interest of protecting the state's Medicaid beneficiaries' access to treatment, not overburdening an already overwhelmed state Medicaid system, and protecting against the wrongful closure of two Arkansas' business without any finding of wrongdoing.  As such, the public interest clearly favors the issuance of an injunction.

11/17/14

## **Conclusion**

For the reasons set forth in above and in the extensive briefing before this Court, the preliminary injunction should be granted because Plaintiffs can establish: 1) a likelihood of success on the merits of their claims; 2) irreparable harm; 3) the balance weighs in favor of granting the preliminary injunction when considering the harm to the movant versus the injury that granting an injunction would cause to other interested parties; and 4) that the granting of the preliminary injunction is in the public's best interest.


Respectfully submitted,

TRINITY BEHAVIORAL HEALTH CARE
SYSTEM, INC. and MAXUS, INC.


By:   /s/ Chuck Banks
       Charles A. Banks, AR Bar #73004
       Banks Law Firm
       100 Morgan Keegan Drive, Ste. 100
       Little Rock, AR 72225-1310
       (501) 280-0100
       Attorneys for Plaintiffs
       Date: November 18, 2014

       and


/s/ Ron Hope
       Ronald A. Hope, AR Bar # 81092
       Hope, Trice, O'Dwyer & Wilson, P.A.
       211 Spring Street
       Little Rock, Arkansas 72201
       (501) 372-4144
       Attorneys for Plaintiffs
       Date: November 14, 2014

11/17/14

## CERTIFICATE OF SERVICE

I, Ronald A. Hope, do hereby certify that I electronically filed the foregoing pleading using the CM/ECF system, which will send notification of such filing to the following:

John Mark White          mark.white@dhs.arkansas.gov

on this 18th day of November, 2014.


/s/ Ron Hope
Ronald A. Hope

## AFFIDAVIT OF ERIC ETCHISON

I, Eric Etchison, being duly sworn and under oath, hereby state the following based upon personal knowledge:

1.    I am over 18 years of age and have personal knowledge of the facts set forth in this affidavit and would testify to the same if called upon to do so.

2.    I am currently the clinical director at Maxus Inc. ("Maxus" or "Provider").

3.    I have a master's degree in counseling and I am a licensed professional counselor in the State or Arkansas.

4.    In my capacity as the clinical director, I have personal knowledge regarding the locations, operations, and patient populations at Maxus' 18 outpatient counseling clinics.

5.    I have general knowledge regarding patient counts, patient attrition, employee and provider retention and operating expenses of Maxus.

6.    I have general knowledge regarding outpatient treatment facilities that exist throughout the state of Arkansas.

7.    I have knowledge regarding the effects of transferring psychiatric patients from outpatient treatment providers.

8.    I have knowledge regarding factors which are relevant to patient trauma caused by transfer of providers for juvenile and adult patients.

9.    I have reviewed the affidavits of Nicole May and Bridget Atkins submitted by DHS in opposition to Providers' request for A Preliminary Injunction.

## *Affidavit of Bridget Atkins*

10.     The affidavit of Bridget Atkins states "Each Maxus Inc. certified RSPMI site is located within a county is served by at least two (2) other certified RSPMI sites operated by other RSPMI providers." (Atkins Affidavit at ¶ 4.)

11.     Ms. Atkins affidavit also states, "Aside from Maxus Inc., there are 274 RSPMI sites located throughout Arkansas certified by DHS Division of Behavioral Health Services." ((Atkins Affidavit at ¶3.)

12.     Ms. Atkins affidavit implies (although it does not directly state this)  that if the suspension was not restrained and Maxus stopped treating its 2600 patients there would be adequate alternative treatment facilities available to Maxus patients with in close proximity to current Maxus treatment centers.

13.     Ms. Atkin's affidavit does not indicate whether any of the other certified RSPMI sites, in the same counties as Maxus counseling centers, have capacity, staffing, facilities and service providers that are adequate to absorb and treat Maxus patients in each of the counties Maxus is currently providing treatment.  She only states that other RSPMI sites exist.

14.     Based upon my knowledge of the other psychiatric counseling and treatment facilities in the state of Arkansas, particularly in the counties that Maxus treats patients, it is my opinion that the existing counseling and treatment facilities in counties where Maxus currently treats patients would not be able to absorb the current patient population of Maxus on a county by county basis.

15.     Ms. Atkin's affidavit also does not address geographic proximity of the "alternative" providers.  The majority of Maxus' patients have limited financial resources.  The

transportation options that exist in the mostly rural counties that Maxus operates are very limited. Requiring patients to travel for treatment, even small distances further than they are currently traveling, may prevent patients from obtaining necessary treatment.

16.     Ms. Atkin's affidavit also does not address the possible consequences to the therapeutic process when the relationship with the trusted therapist is interrupted while the patient is actively working on the identified goals to improve his/her overall mental health. Once a patient is in the therapeutic process and actively working on the goals, if that therapeutic relationship is disrupted, the patient may never re-engage in that process with another therapist to the level where they are once again actively working on those goals.

17.     As of  the filing of this affidavit, despite written notice of the suspension being provided to Maxus patients, only a small percentage of Maxus' patients have transferred to alternative facilities suggesting that the patient preference is to remain with Maxus and that there is not adequate alternative treatment available to patients.

FURTHER AFFIANT SAYETH NAUGHT.

Date:   November 18, 2014

STATE OF ARKANSAS )

COUNTY OF _Faulkner_ )

I, _Ronald W. McDaniel II_, a Notary Public for the above county and state, hereby certify that _Eric Etchis..._ appeared before me on this _18_ day of November, 2014, and being duly sworn to oath, and attested to the execution of this Affidavit.

_____
Notary Public

_May 10, 2021_

My Commission Expires

"OFFICIAL SEAL"
RONALD MCDANIEL
FAULKNER COUNTY
NOTARY PUBLIC - ARKANSAS
Commission No. 12382648
My Commission Expires May 10, 2021

3238052v1/08992-0015

## AFFIDAVIT OF RHONDA LYNK-PEARSON

I, Rhonda Lynk-Pearson, being duly sworn and under oath, hereby state the following based upon personal knowledge:

1.      I am over 18 years of age and have personal knowledge of the facts set forth in this affidavit and would testify to the same if called upon to do so.

2.      I am currently the Admissions Director and a Therapist at Trinity Behavioral Healthcare ("Trinity" or "Provider").

3.      I have a Master's degree in rehabilitation counseling and am currently in the dissertation phase of obtaining my PhD in counseling. I am a licensed professional counselor in the State of Arkansas.

4.      In my capacity as Admission Director and as a Therapist, I have personal knowledge regarding the locations, operations, and patient populations at Trinity's inpatient facility.

5.      I have general knowledge regarding patient counts, patient attrition, employee and provider retention and operating expenses of Trinity.

6.      I have general knowledge regarding the inpatient treatment facilities that exist throughout the state of Arkansas.

7.      I have knowledge regarding the effects of transferring psychiatric patients from inpatient treatment providers and facilities.

8.      I have knowledge regarding factors which are relevant to patient trauma caused by transfer of providers for juvenile and adult patients.

9.      I have reviewed the affidavits of Nicole May and Bridget Atkins submitted by DHS in opposition to Providers' request for A Preliminary Injunction.

**Affidavit of Nicole May**

10.     The affidavit of Ms. May details the number of providers that current beneficiaries of Trinity have received treatment from. (May Affidavit at ¶6a-j.)  It appears that Ms. May is suggesting, by setting forth this information (although she does not state this), that patients of Trinity will not be traumatized by transfer from Trinity because they have treated with multiple providers.

11.     Ms. May's assumption set forth above is incorrect.  The fact that patients have had multiple providers in the past does not suggest that changes in their treatment environment will not have serious adverse effects to their mental health.  Particularly, a juvenile with psychiatric conditions, like patients at Trinity, are particular susceptible to trauma based upon transfer of providers and treatment placement no matter what their previous transition history was with providers in the past.  In my opinion, transfer of juvenile patients from Trinity will likely expose the patients to significant psychological trauma and is not in their best interest.

12.     Additionally, the number of previous providers is not a significant factor in determining whether patients will be traumatized as a result of a psychiatric provider transfer.

13.     Significant factors determining whether a patient will be traumatized as a result of transfer include, time at the patient facility, conditions prior to being placed at the current facility, type of psychiatric illness, and age of the patient.

14.     Based upon my knowledge of the current patients being treated at Trinity, and considering the relevant factors indicating psychiatric trauma from transfer, it is my opinion that

a significant portion of the current Trinity population would suffer psychiatric trauma if removed from Trinity.

15.    Ms. May states in her affidavit, "As of November 10, 2014, there were 64 open residential beds in Arkansas or bordering cities.   However, only 48 of these open residential beds were currently needed for possible placement for Arkansas Medical beneficiaries remaining at Trinity." (May Affidavit at ¶7.)

16.    May's affidavit does not indicate the type of facilities in which the available beds are located.  Trinity patients are currently in a residential setting that is specifically tailored to treat juveniles.  There is no mention in the May affidavit whether the available beds are in adult psychiatric hospitals, adult medical hospitals or other types of facilities.

17.    Transferring juvenile patients from a juvenile residential setting to an adult hospital or adult psychiatric hospital could be detrimental to a juvenile's recovery and cause psychiatric trauma. Many adult facilities are not set up to accommodate juvenile's educational needs as is Trinity so transfer may also cause educational regression.

18.    May's affidavit states the available beds are in "Arkansas or bordering cites." This suggests that the available beds may be outside of the state.  Moving patients outside of the state may cause trauma to juvenile patients, particular those whose parents are of limited means such that patients' families and support systems may not be able to visit them as frequently in an out-of-state facility which could be detrimental to psychiatric healing.

19.    At paragraph 4 of her affidavit, May states, "there were 85 Arkansas medical beneficiaries at Trinity Behavioral Health.  As of November 13, 2014, 37 of the 85 Medicaid

beneficiaries were already discharged from the facility. Of the 37 beneficiaries, 27 returned home." (May Affidavit at ¶4.)

20.    May's affidavit does not account for the fact that a significant portion of the 27 beneficiaries that returned home left because their families were concerned about being financially responsible for treatment as a result of DHS' letter to patients. (A copy of the letter sent by DHS is attached hereto.)   Some of the patients left the facility against medical advice or before their treatment was complete. It is likely a large portion of the patients that "returned home" will need inpatient placement in the immediate future which will not be available based upon the current available inpatient bed count in the State of Arkansas.

21.    Trinity's current patient population is 47 Arkansas patients and one inpatient out of state.

As of the filing of this affidavit the attrition at Trinity is as follows:

16 inpatients have been discharged due to program completion.

16 inpatients have been removed due to parent financial concerns due to phone calls from DHS indicating that they would have to pay for treatment of their children post suspension.

6 patients have been sent to another facility. 4 of these patients were transferred out of state even thought they were all Arkansas residents. It is unclear why these patients would be sent out of state if DHS claims there are available residential beds available in-state.

FURTHER AFFIANT SAYETH NAUGHT.

Date:   November 18, 2014

STATE OF ARKANSAS                    )
                                     )
COUNTY OF _Randolph_                 )

I, _Paulette Kmiecik_ , a Notary Public for the above county and state, hereby certify that appeared before me on this _18th_ day of November, 2014, and being duly sworn to oath, and attested to the execution of this Affidavit.

Notary Public

_11- 14-21_

My Commission Expires

PAULETTE KMIECIK
MY COMMISSION # 12384651
EXPIRES: November 14, 2021
Randolph County

3239103v1/08992-0015                    5

Re: Maxus, Inc. dba Arkansas Counseling Associates

Dear Beneficiary:

Maxus, Inc. (also known as Arkansas Counseling Associates) will be suspended as a Medicaid provider on November 5, 2014. This will affect the services you receive from Maxus. Arkansas Medicaid will not pay for your current behavioral health services at Maxus after November 5, 2014. If you choose to continue your services at Maxus after that date, you will be responsible for paying for them.

Maxus was suspended from Medicaid because of credible allegations of engaging in conduct that defrauds or abuses the Medicaid program. Effective immediately, Arkansas Medicaid will not pay for any new services at Maxus, Inc.

Value Options Arkansas can help you find another Medicaid provider in your area. Value Options Arkansas has set up a toll-free phone number that you can call. The Hotline is open from 8:00 a.m. to 5:00 p.m., Monday through Friday. Please call **1-877-821-0566, then, when asked, select Option 2.**

Please feel free to contact Vivian Jackson, 501-537-1359, or Derica Scott, 501-396-6369, at the Arkansas Medicaid Behavioral Health Unit if you have additional questions or concerns about this letter.

Sincerely,

EXHIBIT 1



**Division of Medical Services**

Medicaid Director's Office

P.O. Box 1437, Slot S401 · Little Rock, AR 72203-1437
501-682-8292 · Fax: 501-682-1197



October 10, 2014

Re: Maxus, Inc. dba Arkansas Counseling Associates

Dear Beneficiary:

Maxus, Inc. (also known as Arkansas Counseling Associates) will be suspended as a Medicaid provider on November 5, 2014. This will affect the services you receive from Maxus. Arkansas Medicaid will not pay for your current behavioral health services at Maxus after November 5, 2014. If you choose to continue your services at Maxus after that date, you will be responsible for paying for them.

Maxus was suspended from Medicaid because of credible allegations of engaging in conduct that defrauds or abuses the Medicaid program. Effective immediately, Arkansas Medicaid will not pay for any <u>new</u> services at Maxus, Inc.

Value Options Arkansas can help you find another Medicaid provider in your area. Value Options Arkansas has set up a toll-free phone number that you can call. The Hotline is open from 8:00 a.m. to 5:00 p.m., Monday through Friday. Please call **1-877-821-0566, then, when asked, select Option 2.**

Please feel free to contact Vivian Jackson, 501-537-1359, or Derica Scott, 501-396-6369, at the Arkansas Medicaid Behavioral Health Unit if you have additional questions or concerns about this letter.

Sincerely,

Dawn Stehle, DHS – DMS Medicaid Director

Cc: Marilyn Strickland, DHS – DMS Chief Operating Officer
Anita Castleberry, DHS – DMS Business Operations Manager
Mark White, DHS Chief Counsel

humanservices.arkansas.gov
**Protecting the vulnerable, fostering independence and promoting better health**
FOI Resp. 2014-10-13. Page 0043



**Division of Medical Services**

Medicaid Director's Office

P.O. Box 1437, Slot S401 · Little Rock, AR 72203-1437
501-682-8292 · Fax: 501-682-1197



October 10, 2014

Re: Trinity Behavioral Health Care

Dear Parent or Guardian:

Trinity Behavioral Health Care will be suspended as a Medicaid provider on November 5, 2014. This will affect the services your child receives from Trinity. Arkansas Medicaid will not pay for staying at Trinity after November 5, 2014. If you choose to continue your child's services at Trinity after that date, you will be responsible for paying for them.

Trinity was suspended from Medicaid because of credible allegations of engaging in conduct that defrauds or abuses the Medicaid program.

ValueOptions Arkansas can help you find services from other Medicaid providers. A Care Coordinator is ready to help you move your child to another provider. You can call Value Options at **1-877-821-0566, then, when asked, press Option 2**. Someone will be available from 8:00 a.m. to 5:00 p.m., Monday through Friday to take your call.

All moves must occur before November 5, 2014, to allow Medicaid payment for services to continue.

Please feel free to contact Vivian Jackson, 501-537-1359, or Derica Scott, 501-396-6369, at the Arkansas Medicaid Behavioral Health Unit if you have questions or concerns about this letter.

Sincerely,

*Dawn Stehle*

Dawn Stehle, DHS – DMS Medicaid Director

Cc: Marilyn Strickland, DHS – DMS Chief Operating Officer
Anita Castleberry, DHS – DMS Business Operations Manager
Mark White, DHS Chief Counsel

**humanservices.arkansas.gov**
**Protecting the vulnerable, fostering independence and promoting better health**
EOI Resp. 2014-10-13. Page 0044

# EXHIBIT 2

## AFFIDAVIT OF  ERIC ETCHISON

I, Eric Etchison, being duly sworn and under oath, hereby state the following based upon personal knowledge:

1.    I am over 18 years of age and have personal knowledge of the facts set forth in this affidavit and would testify to the same if called upon to do so.

2.    I am currently the clinical director at Maxus Inc. ("Maxus" or "Provider").

3.    I have a master's degree in counseling and I am a licensed professional counselor in the State or Arkansas.

4.    In my capacity as the clinical director, I have personal knowledge regarding the locations, operations, and patient populations at Maxus' 18 outpatient counseling clinics.

5.    I have general knowledge regarding patient counts, patient attrition, employee and provider retention and operating expenses of Maxus.

6.    I have general knowledge regarding outpatient treatment facilities that exist throughout the state of Arkansas.

7.    I have knowledge regarding the effects of transferring psychiatric patients from outpatient treatment providers.

8.    I have knowledge regarding factors which are relevant to patient trauma caused by transfer of providers for juvenile and adult patients.

9.    I have reviewed the affidavits of Nicole May and Bridget Atkins submitted by DHS in opposition to Providers' request for A Preliminary Injunction.

*Affidavit of Bridget Atkins*

10.     The affidavit of Bridget Atkins states "Each Maxus Inc. certified RSPMI site is located within a county is served by at least two (2) other certified RSPMI sites operated by other RSPMI providers." (Atkins Affidavit at ¶ 4.)

11.     Ms. Atkins affidavit also states, "Aside from Maxus Inc., there are 274 RSPMI sites located throughout Arkansas certified by DHS Division of Behavioral Health Services." ((Atkins Affidavit at ¶3.)

12.     Ms. Atkins affidavit implies (although it does not directly state this)  that if the suspension was not restrained and Maxus stopped treating its 2600 patients there would be adequate alternative treatment facilities available to Maxus patients with in close proximity to current Maxus treatment centers.

13.     Ms. Atkin's affidavit does not indicate whether any of the other certified RSPMI sites, in the same counties as Maxus counseling centers, have capacity, staffing, facilities and service providers that are adequate to absorb and treat Maxus patients in each of the counties Maxus is currently providing treatment. She only states that other RSPMI sites exist.

14.     Based upon my knowledge of the other psychiatric counseling and treatment facilities in the state of Arkansas, particularly in the counties that Maxus treats patients, it is my opinion that the existing counseling and treatment facilities in counties where Maxus currently treats patients would not be able to absorb the current patient population of Maxus on a county by county basis.

15.     Ms. Atkin's affidavit also does not address geographic proximity of the "alternative" providers.  The majority of Maxus' patients have limited financial resources.  The

transportation options that exist in the mostly rural counties that Maxus operates are very limited. Requiring patients to travel for treatment, even small distances further than they are currently traveling, may prevent patients from obtaining necessary treatment.

16.     Ms. Atkin's affidavit also does not address the possible consequences to the therapeutic process when the relationship with the trusted therapist is interrupted while the patient is actively working on the identified goals to improve his/her overall mental health. Once a patient is in the therapeutic process and actively working on the goals, if that therapeutic relationship is disrupted, the patient may never re-engage in that process with another therapist to the level where they are once again actively working on those goals.

17.     As of the filing of this affidavit, despite written notice of the suspension being provided to Maxus patients, only a small percentage of Maxus' patients have transferred to alternative facilities suggesting that the patient preference is to remain with Maxus and that there is not adequate alternative treatment available to patients.

FURTHER AFFIANT SAYETH NAUGHT.

Date:   November 18, 2014

STATE OF ARKANSAS          )
                           )
COUNTY OF _Faulkner_       )

I, _Ronald W. McDaniel II_, a Notary Public for the above county and state, hereby certify that _Eric Etchise_
appeared before me on this __18__ day of November, 2014, and being duly sworn to oath, and
attested to the execution of this Affidavit.

_Ronald W. McDaniel_
                                              Notary Public

_May 10, 2021_

My Commission Expires

```
"OFFICIAL SEAL"
RONALD MCDANIEL
FAULKNER COUNTY
NOTARY PUBLIC - ARKANSAS
Commission No. 12382648
My Commission Expires May 10, 2021
```

3238052v1/08992-0015

# EXHIBIT 3

## AFFIDAVIT OF RHONDA LYNK-PEARSON

I, Rhonda Lynk-Pearson, being duly sworn and under oath, hereby state the following based upon personal knowledge:

1.      I am over 18 years of age and have personal knowledge of the facts set forth in this affidavit and would testify to the same if called upon to do so.

2.      I am currently the Admissions Director and a Therapist at Trinity Behavioral Healthcare ("Trinity" or "Provider").

3.      I have a Master's degree in rehabilitation counseling and am currently in the dissertation phase of obtaining my PhD in counseling. I am a licensed professional counselor in the State of Arkansas.

4.      In my capacity as Admission Director and as a Therapist, I have personal knowledge regarding the locations, operations, and patient populations at Trinity's inpatient facility.

5.      I have general knowledge regarding patient counts, patient attrition, employee and provider retention and operating expenses of Trinity.

6.      I have general knowledge regarding the inpatient treatment facilities that exist throughout the state of Arkansas.

7.      I have knowledge regarding the effects of transferring psychiatric patients from inpatient treatment providers and facilities.

8.      I have knowledge regarding factors which are relevant to patient trauma caused by transfer of providers for juvenile and adult patients.

3239103v1/08992-0015

9.     I have reviewed the affidavits of Nicole May and Bridget Atkins submitted by DHS in opposition to Providers' request for A Preliminary Injunction.

**Affidavit of Nicole May**

10.     The affidavit of Ms. May details the number of providers that current beneficiaries of Trinity have received treatment from. (May Affidavit at ¶6a-j.)  It appears that Ms. May is suggesting, by setting forth this information (although she does not state this), that patients of Trinity will not be traumatized by transfer from Trinity because they have treated with multiple providers.

11.     Ms. May's assumption set forth above is incorrect.  The fact that patients have had multiple providers in the past does not suggest that changes in their treatment environment will not have serious adverse effects to their mental health.  Particularly, a juvenile with psychiatric conditions, like patients at Trinity, are particular susceptible to trauma based upon transfer of providers and treatment placement no matter what their previous transition history was with providers in the past.  In my opinion, transfer of juvenile patients from Trinity will likely expose the patients to significant psychological trauma and is not in their best interest.

12.     Additionally, the number of previous providers is not a significant factor in determining whether patients will be traumatized as a result of a psychiatric provider transfer.

13.     Significant factors determining whether a patient will be traumatized as a result of transfer include, time at the patient facility, conditions prior to being placed at the current facility, type of psychiatric illness, and age of the patient.

14.     Based upon my knowledge of the current patients being treated at Trinity, and considering the relevant factors indicating psychiatric trauma from transfer, it is my opinion that

a significant portion of the current Trinity population would suffer psychiatric trauma if removed from Trinity.

15.     Ms. May states in her affidavit, "As of November 10, 2014, there were 64 open residential beds in Arkansas or bordering cities.   However, only 48 of these open residential beds were currently needed for possible placement for Arkansas Medical beneficiaries remaining at Trinity."  (May Affidavit at ¶7.)

16.     May's affidavit does not indicate the type of facilities in which the available beds are located.  Trinity patients are currently in a residential setting that is specifically tailored to treat juveniles.  There is no mention in the May affidavit whether the available beds are in adult psychiatric hospitals, adult medical hospitals or other types of facilities.

17.     Transferring juvenile patients from a juvenile residential setting to an adult hospital or adult psychiatric hospital could be detrimental to a juvenile's recovery and cause psychiatric trauma. Many adult facilities are not set up to accommodate juvenile's educational needs as is Trinity so transfer may also cause educational regression.

18.     May's affidavit states the available beds are in "Arkansas or bordering cites." This suggests that the available beds may be outside of the state.  Moving patients outside of the state may cause trauma to juvenile patients, particular those whose parents are of limited means such that patients' families and support systems may not be able to visit them as frequently in an out-of-state facility which could be detrimental to psychiatric healing.

19.     At paragraph 4 of her affidavit, May states, "there were 85 Arkansas medical beneficiaries at Trinity Behavioral Health.  As of November 13, 2014, 37 of the 85 Medicaid

beneficiaries were already discharged from the facility.  Of the 37 beneficiaries, 27 returned home."  (May Affidavit at ¶4.)

20.     May's affidavit does not account for the fact that a significant portion of the 27 beneficiaries that returned home left because their families were concerned about being financially responsible for treatment as a result of DHS' letter to patients.  (A copy of the letter sent by DHS is attached hereto.)   Some of the patients left the facility against medical advice or before their treatment was complete.  It is likely a large portion of the patients that "returned home" will need inpatient placement in the immediate future which will not be available based upon the current available inpatient bed count in the State of Arkansas.

21.     Trinity's current patient population is 47 Arkansas patients and one inpatient out of state.

As of the filing of this affidavit the attrition at Trinity is as follows:

16 inpatients have been discharged due to program completion.

16 inpatients have been removed due to parent financial concerns due to phone calls from DHS indicating that they would have to pay for treatment of their children post suspension.

6 patients have been sent to another facility. 4 of these patients were transferred out of state even thought they were all Arkansas residents.  It is unclear why these patients would be sent out of state if DHS claims there are available residential beds available in-state.

FURTHER AFFIANT SAYETH NAUGHT.

Date:   November 18, 2014

STATE OF ARKANSAS          )
                           )
COUNTY OF _Randolph_       )

I, _Paulette Kmiecik_ , a Notary Public for the above county and state, hereby certify that
appeared before me on this ___18th___ day of November, 2014, and being duly sworn to oath, and
attested to the execution of this Affidavit.

Notary Public

___11- 14-21___

My Commission Expires

PAULETTE KMIECIK
MY COMMISSION # 12384651
EXPIRES: November 14, 2021
Randolph County